BABCOCK *v.* PUBLIC BANK.

1. APPEAL AND ERROR—CROSS APPEAL.

Cross appeal of plaintiff in action against bank and 3 directors in which judgment had been entered against bank only is not considered, where judgment is affirmed and plaintiff had indicated the cross appeal should be considered withdrawn in event of affirmance.

2. ATTORNEY AND CLIENT—PREINCORPORATION SERVICES TO BANK— WAIVER—CONTINGENT FEE CONTRACT.

Response of attorney to State banking commissioner's inquiry as to amount of "expense for legal fees *incurred* by your organization prior to the date of filing" articles of incorporation wherein attorney stated that the bank "has not *incurred* any expense for legal fees prior to the date of the filing of  *   *   *

REFERENCES FOR POINTS IN HEADNOTES

[1] 3 Am Jur, Appeal and Error § 762.
[3] 5 Am Jur, Attorneys at Law § 198.
[4] 5 Am Jur, Attorneys at Law §§ 163, 164.
[5] 20 Am Jur, Evidence § 120.
[7] 45 Am Jur, Release § 11.

articles of incorporation * * * on" date articles were filed *held*, not to have constituted a waiver of such fees, where attorney's contract for preincorporation services was contingent upon issuance of certificate of authority to do business.

3. SAME—PREINCORPORATION SERVICES TO BANK—FEE—SUCCESS.

Judgment of $85,000 in nonjury case by plaintiff attorney against bank for preincorporation services rendered on contingency of procurement of certificate of authority to function and which involved the expenditure of upwards of 700 hours of time in course of period of over 3 years, and resulted in success, is not disturbed on appeal; a more liberal compensation being allowable in successful cases where none is to be received in case of failure.

4. SAME—CONTINGENT FEE CONTRACTS.

Agreements between attorney and client, for compensation of the attorney contingent on client-beneficial results, are not unlawful nor unethical except as they are unreasonable (Canons of Professional Ethics, No 13).

5. EVIDENCE—JUDICIAL NOTICE—LAW OFFICE OVERHEAD.

Judicial notice is taken that at least 35% of the gross income of the modern and efficiently operated law office in this State goes for overhead.

6. ATTORNEY AND CLIENT—CONTINGENT FEE CONTRACT FOR SERVICES— WAIVER.

A lawyer should be paid as agreed under a contingent fee contract, unless by some valid form of contracted acquittance or waiver, he has released to the client such ultimately matured right.

7. SAME—WAIVER OR RELEASE—CONSIDERATION.

Letter which is relied on by defendant bank as attorney's waiver of right to pay for preincorporation services rendered over a 3-year period, when construed along with circumjacent facts *held*, not to have effected the claimed release, especially in the absence of any consideration moving to the attorney for such release.

8. SAME—CONTINGENT FEE CONTRACT—FRAUD.

Letter of attorney to State banking commissioner stating that the bank "has not *incurred* any expense for legal fees prior to the date of filing of * * * articles of incorporation * * * on" date articles were filed *held*, under all circumstances present, not to have constituted a basis for a finding of fraud upon part of attorney who, after bank had obtained authority to function as a going concern, sued to recover fees for preincorporation services under a contingent fee contract dependent

upon results for imposition of liability for fee (Canons of Pro-
fessional Ethics Nos 17, 32).

Appeal from Wayne; Bowles (George E.), J. Submitted January 5, 1962. (Docket No. 45, Calendar No. 49,300.) Decided March 19, 1962. Rehearing denied April 12, 1962.

Action by John W. Babcock against Public Bank, a Michigan banking association, Joseph F. Verhelle and others for attorney fees in connection with organization of bank. Judgment for plaintiff against defendant bank but not against individuals. Defendant bank appeals. Plaintiff cross-appeals as to certain individual defendants. Affirmed.

*Chris M. Youngjohn,* for plaintiff.

*Piggins, Balmer, Grigsby, Skillman & Erickson* and *Marx, Levi, Thill & Wiseman,* for defendants.

BLACK, J. This suit was brought by the plaintiff attorney to recover the value of preincorporation legal services rendered between May 21, 1954, and June 4, 1957, at behest of the promoters and incorporators of the Public Bank, of Detroit, a presently going and prosperous concern. The bank and certain of the promoters, later becoming directors of the bank, are named as defendants. One of them, Joseph F. Verhelle, was the principal promoter and organizer of the bank and is now its president.

Trial to the court resulted in a judgment for the plaintiff, against the defendant bank only, in the sum of $85,000. The bank appealed and asks for reversal and remand for entry of general judgment of no cause. Plaintiff cross-appealed and, in his brief, asks for affirmance as against the bank with remand for entry of judgment in the same amount against the bank plus individual defendants Ver-

helle, Skillman, Mahoney, and Crusoe. In view of our decision to affirm the present judgment we do not consider such cross appeal.*

Some of the circumjacent facts were before us in *Verhelle* v. *State Banking Comr.*, 347 Mich 612. A part of the services for which plaintiff sues were rendered by him during the course of successful prosecution, in the Ingham circuit and in turn here, of the *Verhelle Case*. The remaining facts are gathered in an able opinion of the trial judge which, if it were not for the understandably lengthy factual findings and conclusions assembled therein, we might well adopt.

Two salient issues are presented. The first, once resolved, will determine whether plaintiff is entitled to recover any amount from the bank. Should that issue be resolved affirmatively, the second issue is exclusively one of amount the plaintiff is entitled to recover from the bank.

*First:* It is *not* seriously disputed that plaintiff's services were arduous and continuous, and that they extended over a period of 3 years to final success; that of receiving the bonanza-chartered right of the organized bank to open its doors and enter the banking business in Michigan. It *is* claimed, and this is the first issue to which reference was made above, that plaintiff waived his right to recover for such services by means of a letter written—the day before the bank's doors were opened for business—in circumstances detailed by the trial judge as follows:

"Verhelle received from the State commissioner of banking a letter dated December 6, 1957, which said, in part:

"'It is requested that a statement be submitted setting forth costs incurred in connection with pro-

---

* At oral argument plaintiff asked that his cross appeal be considered withdrawn in event of determination by the Court to affirm the present judgment.

viding quarters (in which operation is to be conducted) and equipment and fixtures together with a report of all other expenses paid and accrued to date broken down as to main categories such as salaries, legal expense, et cetera.'

"Verhelle replied on the next day saying, among other things,

" 'We are pleased to give you the following information regarding certain costs and expenses as requested by your letter of December 6, 1957 * * * Legal expense has been deferred by the generous cooperation of our attorneys. The amount of such legal expense will be determined by the board of directors only after the work of organization has been completed and the bank is open to the public for banking business.'

"On December 11th, the State commissioner of banking responded:

" 'I regret that the second paragraph of my letter to you of December 6, 1957, did not fully express the amount of detail we desired from you regarding costs of quarters, legal expense, et cetera. Therefore, would you please give us detailed information as follows:

" '(1) The expense for legal fees incurred by your organization prior to the date of filing Public Bank's articles of incorporation with this commission.

" '(2) The amount of legal fees which have been incurred since the date of filing Public Bank's articles of incorporation.'

"Verhelle responded on December 14, 1957:

" 'I regret that my letter of December 7, 1957, did not fully cover the 4 points called for by your letter of the 11th. In reply:—

" ' "(1) The expense for legal fees incurred by your organization prior to the date of filing Public Bank's articles of incorporation with this commission;"

" 'My statement of December 7th was based on the action taken by our board of directors as set forth in the minutes of its meeting of June 6, 1957. On that day the board of directors appointed a special

committee composed of Directors Connor, Mahoney and Skillman, to study the question of compensation to Mr. Babcock for his professional services prior to incorporation and to make a recommendation to the board of directors of the amount thereof. As yet this committee has not reported any recommendation to the board.    *    *    *

" ' "(2) The amount of legal fees which have been incurred since the date of filing Public Bank's articles of incorporation;"

" 'I have been informed by Mr. Babcock that his total compensation for all such services to Public Bank will not exceed $5,000. As you know considerable legal work has been involved.'

"On December 16, 1957, Verhelle had a long distance telephone conference with the banking commissioner in which the banking commissioner indicated that Verhelle wrote long letters but did not answer his question, further stating he wanted a specific answer as to the amount of legal fees for pre-incorporation legal expenses. Verhelle summoned Mr. Edward Connor and the plaintiff to a late meeting at Housey's Restaurant in Detroit, Michigan, and reported to them his conversation with the banking commissioner. Plaintiff testified upon trial that Verhelle at this meeting at Housey's Restaurant asked the banking commissioner in their discussion what he would do with a figure if Verhelle were able to obtain one for him, and the banking commissioner said he would refer it to his attorney.

"Plaintiff testified on trial that Verhelle told the plaintiff and Mr. Connor that if there were any delay, even of 2 or 3 weeks in getting the doors of the bank open for business, many subscribers for stock would cancel their subscriptions and the bank would never be able to open. Plaintiff told Verhelle and Connor that it was his opinion that the banking commissioner had no right to ask this information or to delay issuing a certificate of authority to engage in the business of banking until receiving informa-

tion; that it was his view that the commissioner could only inquire as to the amount of money paid in on account of its capital surplus, the name and place of the residence of its directors, the amount of its capital stock of which each is the owner in good faith, and whether the bank had complied with all of the provisions of the statute so far as entitling it to engage in the business of banking; that the only requirement provided by the statute relating to paid-in funds with which to commence the business of banking was that the new bank have a surplus equal to 20% of its capital and that the Public Bank had surplus of $400,000 which was twice as much as the statutory requirement and an undivided profits account of $266,666.67, which is nowhere mentioned in the statute, but it would probably be more prudent to avoid an issue with the commissioner, and since the terms of compensation to plaintiff included the contingency of the bank actually engaging in the business of banking and since no action had been taken to change that contingency or to fix any amount to be paid upon the happening of the contingency, it would be a simple and factual answer to the inquiry of the commissioner to say that nothing had been incurred for professional services prior to the filing of the articles of incorporation.

"Verhelle and Connor agreed with the plaintiff that a reply in this manner should be made, the language following as closely as possible the language of the commissioner's inquiry. On December 17, 1957, plaintiff drafted a letter addressed to Public Bank and signed it, which letter was delivered to Verhelle, and reads:

" 'This will be an expression not only of my opinion as counsel for Public Bank but also of my personal agreement therewith, that Public Bank has not incurred any expense for legal fees prior to the date of the filing of Public Bank's articles of incorporation with the department of banking of the State of Michigan on June 4, 1957.' "

This is the letter of "waiver" on which appellant relies. Judge Bowles considered it in the light of all attendant circumstances and arrived at these conclusions:

"Defendants have interposed a number of alternative defenses, all based upon the propositions that the plaintiff's letter of December 17, 1957, constituted a waiver of any right to compensation for legal services rendered before incorporation, and that having so written such letter, plaintiff is estopped to assert such a claim and, indeed, is guilty of fraud. We do not so construe the letter.

"Plaintiff's explanation and theory are credible and convincing even in the face of the testimony of a number of defendants, all honorable men, that their understanding was that the plaintiff was giving up his right to any fee before incorporation and that the bank did not owe him 'anything.' The position of an attorney who has rendered valuable services over a long period of time is patently different from that of a promoter or a lender or a man engaged in some other business or profession. Such a man can look to improving himself through the activities of a bank successfully in operation but an attorney has no such assurance as the facts of this case so eloquently show. Though he be named general counsel he has no assurance of tenure and, indeed, in this case if the theory of defendants be that a contract as general counsel for plaintiff was one of the moving considerations in law and in fact for his waiver, it is difficult to perceive what that contract was as to duration or as to terms. At most there might have been an expectation, a hope, but certainly never any assurance or anything close to a promise in law that would induce an attorney to waive fees for services rendered over a period of 3 years.

"Let us examine the letter   *   *   *   [here the judge quotes, again, the above letter of December 17th]:

"The pivotal word is 'incurred.' This was a contingent contract, the terms of which were that nothing would be owed until and unless a certificate issued; there could be nothing due and owing until a certificate did issue. There was no obligation legally enforceable against anyone until such a certificate issued. While others could differ as to the meaning of the word 'incurred' plaintiff's interpretation is one asserted in good faith and worthy of acceptance. Indeed, defendants have relied upon a dictionary definition. Webster defines 'incur' as:

"Incur (from which incurred is derived) as: 'To meet * * * with, as something inconvenient or harmful; to become liable or subject to.'

"No one became liable to the plaintiff until the certificate issued."

We are not persuaded that this reasoning is erroneous. It is adopted in conjunction with our separate conclusions, headed "general summary," appearing at end of this opinion.

*Second:* Plaintiff brought to the stand 2 eminent members of the Detroit Bar to testify respecting the monetary worth of the services for which he had brought suit. One, Leo I. Franklin, a former commissioner of the integrated State Bar, former president of the Detroit Bar Association and veteran member of one of Detroit's older and better known law firms, testified that plaintiff's services warranted a charge of $85,000 to $90,000. The other, Charles Rubiner, has practiced law continually in Detroit since 1919 and, for a number of years, has been a member of the "advisory fee committee" of the Detroit Bar Association. His qualifications were conceded, and his eminence and experience are well known in Detroit legal circles. Mr. Rubiner testified that if there were "no issue of contingency," and if the fees were "to be based entirely upon a *quantum meruit* basis," he would set the fee at $50,000. He

testified further that, if Mr. Babcock had done the work on a pure basis of contingency, that he "wouldn't consider any fee between $75,000 and $100,000 in the light of all of the circumstances to be unreasonable."

Appellant's counsel, resorting to minimal rates promulgated by the Detroit Bar Association and the testimony of another reputable member of the Detroit Bar, Gordon McCabe, assert that the amount should be less than half that which was testified to by Messrs. Franklin and Rubiner. The rates of course do not take into account the value of results accomplished or the eminence of counsel, and Mr. McCabe's testimony was not accepted by the trial judge as against that of Messrs. Franklin and Rubiner. The latter properly applied, to their testimony, the rule that more liberal compensation is allowable "in successful cases, where none is to be received in case of failure." (See *Taylor* v. *Bemiss*, 110 US 42, 45 [3 S Ct 441, 28 L ed 64]; also annotator's copiously supported note in 56 ALR2d 36, 37.)

The trial judge, relying particularly upon the testimony of attorneys Franklin and Rubiner, found that the plaintiff attorney had established devotion of "upwards of 700 hours" of his time to "varied legal services, some of them in the office, others out of the office, some of them in Court and some of them in related services rendered to defendants in respect to real-estate sites, options, and the like," and concluded that a fee of $85,000, for the services sued upon, had reasonably been earned. Here again appellant has failed to persuade any member of the Court that he should disagree with such findings.

*General summary:* This case involves ethical as well as legal considerations which, brought into court, affect the profession generally. The honesty of a skilled and reputable member of the Michigan

Bar* is called into question. It is charged that his quoted letter of December 17th, considered with the temerity of this suit, amounts to a fraudulent breach of Canon 32, titled *"The Lawyer's Duty in its Last Analysis."* (For the Canons, see Honigman Michigan Court Rules Annotated, 1959 Supp, p 371 *et seq.*) The charge calls for a compendium of comment upon certain decisive facts and inferences which, if not wholly undisputed, are established by what we call clear preponderance.

Agreements between attorney and client, for compensation of the attorney contingent on client-beneficial results, are not unlawful. Nor are they unethical save only when it is shown that the rule of "reasonableness," imposed by Canon 13, has been violated. They are in fact necessary in many commonly known instances else legal rights be denied the client who cannot risk the required sum or sums on a venture with respect to which he would have his attorney risk the latter's sole stock in trade—his time. Here, preponderantly proven, an ultimately successful attorney steadily risked portions of his time over a period of 3 years on that which meant total loss, not alone of time but of not inconsiderable overhead,† had the charter-goal not been reached. He should be paid as agreed unless, by some valid form of contracted acquittance or waiver, he has released to the defendants such ultimately matured right. To make it plain, there doubtless would have been no Public Bank but for the consequential success shown by the *Verhelle Case, supra,* and the plaintiff's subsequent work.

---

* For many years Mr. Babcock has received Martindale's highest rating of legal ability and recommended reliability.

† We take notice that at least the first 35% of the gross income of the modern and efficiently operated Michigan law office goes for overhead. Looking at it this way, as we should, the gross fee adjudged below in favor of Mr. Babcock, for signal results accomplished, is far from shocking.

The trouble with appellant's claim that Mr. Babcock released everything, by the letter of December 17th, is that it would have us look at that letter alone, rather than all of the documented proof. The idea seems to be that something happened to Mr. Babcock's definitely agreed contingent right during the few days preceding the execution of such letter. Yet if that were true it would seem that something more than the say-so of counsel would appear in the proof, such as evidence of a new agreement founded on some new consideration moving to Mr. Babcock. There is no such evidence; certainly none that Mr. Babcock agreed with any defendant, between December 14th and December 17th of 1957, to release his contingent right in return for some newly acceptable consideration. And the latter was both vital and necessary to validity of any such new agreement since waiver of a substantial right, like release thereof, is a matter of contract which requires a consideration.*

Now let us examine the rest of such documented proof.

The first and organizational meeting of the board of directors of the new bank was held June 6, 1957. The minutes thereof recite:

"By unanimous action of the directors and upon recommendation of the chairman, Directors Connor, Mahoney and Skillman were selected as a special committee to confer with Mr. John W. Babcock relative to the amount of compensation to be paid him for his professional services in assisting in the organization of this bank since the beginning of such effort in June of 1954 and to report to this board such recommendation as they may have to make at their earliest convenience."

* See 56 Am Jur, Waiver, § 16, headed "Consideration," pp 116, 117, and cases cited to the text thereof.

June 21, 1957, Mr. Babcock submitted to such "special committee," at its request, a lengthy memorandum outlining the nature of the work done by him and suggesting a fee of "$78,000 for all services in the organization and establishment of the bank up to and including June 20, 1957." The memorandum opens and proceeds:

"First then consider the nature of the employment. From the beginning it has been of that class known as contingent, *viz.,* dependent upon the successful organization of the bank, upon the recognition of the board of directors of the bank of my services as services rendered in behalf of the bank, and upon final determination by said board of its judgment of a fair amount as compensation. During this 3-year period of organizing effort and, more or less continuous litigation, neither Mr. Verhelle nor any other individual was obligated to pay me for my services. Had the organization of the bank failed either because of an adverse decision by the courts, because of death of those having the great interest in the promotion effort, or for any other reason, my services would have been rendered and my time expended without prospect of compensation. Such was the understanding between Mr. Verhelle and me from the very beginning and so today the fact of compensation and the amount thereof rests entirely in the sound judgment of the board of directors of Public Bank."

No record or instrument contradicts these made-at-the-time written declarations of Mr. Babcock. The "special committee" did not act and the open question of the amount of Mr. Babcock's fee, for such preincorporation services, was left in abeyance until the bank's charter was obtained. We proceed:

Mr. Verhelle wrote the banking commissioner under date of December 7, 1957 (for complete quotation see above portions of the trial judge's opinion), that "legal expense has been. *deferred* by the generous

cooperation of our attorneys" and that the amount of such expense "will be determined by the board of directors only after the work of organization has been completed and the bank is open to the public for banking business." He added, by letter to the banking commissioner dated December 14, 1957, that the appointed "committee has not reported any recommendation to the board" and that Mr. Babcock had "advised the committee that he can only leave to the judgment of its members such recommendation as they feel they should make to the board of directors." Here, then, as late as December 14th according to the bank's president, we find full recognition of the board of directors that the amount Mr. Babcock should be allowed for services "prior to incorporation" had not as yet been determined. Reading all these records, unitarily with Mr. Babcock's letter of December 17th, it would seem that the trial judge was fully justified in concluding that plaintiff and the board of directors agreed to "defer" determination of the amount of plaintiff's fees until the pivot-contingency occurred and, until such contingency did occur, that the bank should be considered as having "incurred" nothing. Indeed, Judge Bowles could not have concluded otherwise without attributing to the directors the rather nefarious intent of taking *all* fruits of Mr. Babcock's work by way of a foxy freeze out.*

We have not overlooked appellant's vigorously argued contention that Mr. Babcock's letter of December 17th was written to lead the banking commissioner to believe that the bank was not, and would not, be obligated to him in any amount, and that this suit should be dismissed with prejudice as fraught with fraud. It is sufficient to say that the commissioner is not complaining of fraud and that the de-

---

* See the somewhat similar and fact-related case of *Urben* v. *Public Bank,* 365 Mich 279.

fendant bank instigated the alleged deception of which it complains. We cannot hear, any too well, the complaint of those who, but days earlier and without intervening agreement of waiver or release, had represented to the commissioner that the bank's upcoming obligation "has been deferred by the generous cooperation of our attorneys" and that the amount thereof "will be determined by the board of directors." The manifest conclusion is that all of the parties were cooperating together to avoid more delay in the banking department and that the letter of December 17th was conceived of joint care to avoid such delay and yet preserve that which is implicit in earlier letters to the commissioner. We find no fraud, actionable or otherwise, in the case before us.

Judgment affirmed. Costs to plaintiff.

DETHMERS, C. J., and CARR, KELLY, KAVANAGH, SOURIS, OTIS M. SMITH, and ADAMS, JJ., concurred.