# STATE OF MICHIGAN

# COURT OF APPEALS

CARLA ABRAHAM,

        Plaintiff-Appellant/Cross Appellee,

v

FARMERS INSURANCE EXCHANGE,

        Defendant-Appellee/Cross
        Appellant,

and

U.S. DISASTER SERVICES LLC, doing business
as SERVICE MASTER DON'T PANIC,

        Defendant-Appellee.

UNPUBLISHED
August 21, 2018

No. 335353
Wayne Circuit Court
LC No. 14-014367-NO

Before: SWARTZLE, P.J., and SHAPIRO and BOONSTRA, JJ.

PER CURIAM.

Plaintiff, Carla Abraham, appeals the trial court's order granting defendants' motions for summary disposition. For the reasons set forth below, we affirm the grant of summary disposition to Farmers Insurance, reverse the grant of summary disposition to U.S. Disaster, and remand for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

Plaintiff, Carla Abraham, is the daughter of Lillian Abraham. Lillian owned a home in Melvindale, Michigan ("Melvindale home"). Due to Lillian's ill health, she moved out of the home in 2011, before this case arose, and signed a power of attorney giving plaintiff broad authority to act on her behalf. Plaintiff lived in Canada, but regularly came to Michigan to see her mother and to check on the home. According to her testimony, there were times that she stayed at the Melvindale home for extended periods, including the year following the flood giving rise to this case. The Melvindale home was covered by a homeowners insurance policy

-1-

issued by defendant Farmers Insurance Exchange ("Farmers"), that covered remediation[1] of structural damage due to flood/water damage resulting from a leaking home appliance, but specifically excluded remediation of mold damage.[2]

On February 13, 2012, plaintiff arrived at the Melvindale home in the evening, and discovered that water had leaked from the refrigerator, flooding the kitchen floor, part of the hallway, and some areas in the basement. After plaintiff cleaned up as much water as she could, she contacted Farmers and reported the flooding. According to Famers' initial loss report, plaintiff reported:

> Floorboards in laundry room are soaked and turning black. Water is dripping through ceiling into basement. Wood planks in ceiling are soaked. Kitchen pergo flooring is bubbled.

Farmers assigned the claim to its adjuster, Gisele Walsh. Walsh contacted plaintiff by telephone and advised that obtaining remediation services could proceed in one of two ways. First, the insured could hire any mitigation specialist she selected. In such case, Farmers would pay that portion of the bill it concluded was a reasonable fee for covered services; any billing greater than that amount would be the insured's responsibility. Alternatively, the insured could agree to use a mitigation company recommended by Farmers through what it called its Emergency Mitigation Referral Program (EMRP). If an insured chose this option, the

---

[1] The policy defines "remediation," stating:

Remediate—means to:

a.      (1) decontaminate, abate, treat, contain, isolate, remove, extract, clean, mitigate, neutralize, quarantine or detoxify;

(2) monitor, evaluate, detect, investigate, test or measure for;

(3) haul away or dispose of;

(4) respond in any way to, or assess the effects of

Any nuclear substance, noxious substance, pathogen, fungus, or pollutant, or any contamination, whether on or off the residence premises; or

b.      remove, restore or replace any land, water, air, building, structure or personal property which is threatened with or has been affected, damaged, infested, polluted or injured by contamination.

[2] The exclusion states, "We do not insure loss or damage consisting of, composed of or which is fungi unless if by fire or lightning . . . we do not insure any remediation . . . for expenses directly or indirectly due to, arising out of or resulting from remediation of fungi."

recommended mitigation company would bill Farmers directly and no fees would be billed to the insured beyond any applicable deductible. If the recommended company performed work that was not covered under the policy, Farmers would still be liable for those fees, but only through the end of the day on which it determined there was no coverage.[3]

Farmers recommended U.S. Disaster Services LLC d/b/a Service Master Don't Panic ("U.S. Disaster") under the EMRP program, and plaintiff, acting on behalf of her mother, agreed to retain them under the conditions of that program.

U.S. Disaster arrived at the Melvindale home on February 15, 2012. It appears that on that date,[4] plaintiff signed a U.S. Disaster's form captioned "Work and Direct Payment Authorization" document. The contract named Lillian, plaintiff's mother, as the insured homeowner. The terms of the contract provided that "the Company and Homeowner listed above herein referred to as the CUSTOMER, [agree] to proceed with the COMPANY'S recommended procedures to preserve, protect and secure [the property] from further damage . . .

---

[3] In her claim notes, Walsh stated that she told plaintiff that:

> 1. The EMRP program was an independent service offered to our insureds and that use of an EMRP vendor was voluntary. The customer was free to contact with any water mitigation vendor the customer wished and the customer would be responsible for authorizing and drying and/or other work by the vendor, including demolition. However, we would only pay reasonable and necessary amounts based on the mitigation services required.
>
> 2. If the deductible was not met, the insured would owe any remaining deductible directly to the program vendor and we would review the EMRP bill for accuracy before making payment directly to the vendor for their services after the deductible.
>
> 3. If the loss was not covered, we would pay only pay the cost of emergency mitigation services by an EMRP program vendor through the end of the day on which we determined there was no coverage, excluding any buildback costs associated with demolition completed to facilitate the drying process.

[4] As with many of the documents in this case, the dating of the contract is quite confusing and in some respects inexplicable. The document itself is dated 2/21/12, which is three days after the last day on which work was performed. However, the printed date next to plaintiff's signature at the bottom is 2/15/12. In addition, the signature is the only item on page two of the document. The entire text of the contract is on page one. Another document captioned "AUTHORIZATION FOR REPAIRS & PAYMENT," is dated 2/21/12 while the signature on it is dated 2/17/12. The RELEASE OF LIABILITY, which will be discussed later in this opinion, is dated 2/21/12 with a signature dated 2/15/12. And the "CERTIFICATE OF COMPLETION AND SATISFACTION," also discussed below, is dated 2/21/12 while the signature on it is dated 2/18/12.

." It went on to state, "The COMPANY will undertake best efforts to clean and remove any mold and mildew it discovers but does not have the ability to guarantee identification or removal of all mold or mildew which may be present in the areas serviced, or in other areas of the structure . . . CUSTOMER hereby agrees to release and hold harmless the COMPANY from any liability for the existence of undetected mold and mildew and any resulting effects or damages therefrom." Finally, it stated that "The COMPANY represents that its employees have been trained to perform remediation and restoration services of the highest quality and in a workmanlike manner."

U.S. Disaster conducted remediation services, including setting up drying fans and vacuuming the water on the floor of the kitchen, basement, and hallway. On the third and final day of work, U.S. Disaster's employees removed a portion of the linoleum flooring in the kitchen and detected the presence of mold in the subfloor. As noted, the contract between the homeowner and U.S. Disaster provided that U.S. Disaster "will undertake best efforts to clean and remove any mold and mildew it discovers." However, when the mold was discovered, U.S. Disaster employees did not attempt to "clean and remove any mold" other than to spray the subfloor with an antimicrobial chemical, an action which U.S. Disaster concedes, is at best, a means to prevent mold from spreading, not to eliminate or contain it. After spraying, U.S. Disaster ceased work and left the premises never to return.

U.S. Disaster's estimator, Daniel Wise, conceded that after he discovered the wet subfloor and identified mold, the company stopped work even though they had not completed the water remediation. Wise testified that the company had achieved only "partial mitigation" and that it did not "successfully reach dry standard." He testified that he discussed the options with plaintiff and that she agreed to the cessation of work. By contrast, plaintiff testified that neither Wise nor any other U.S. Disaster employee ever told her that there was mold growth in the home, that she should retain an environmental consultant, or that it was unsafe to remain in the home. Plaintiff also testified that she overheard a call between a U.S. Disaster employee and Farmers in which the employee asked, "Should I take [the subfloor] out or leave it in?" and that the Farmers' representative told the employee to leave the subfloor in place rather than complete the remediation.

Wise disputed plaintiff's claim that he took direction from Farmers regarding the mold, and testified that any decision to stop work was made solely by his company after consultation with plaintiff. He agreed, however, that he had a phone conversation with someone from Farmers about the subfloor. He testified that he called the company and recommended that before removing the subfloor, an Indoor Air Quality (IAQ) test should be conducted to determine the extent of airborne mold in the home. It is reasonable to infer that during that phone call, there was discussion about whether removal of the subfloor was covered by the policy because according to Wise, the Farmers' representative told him that Farmers would "reach out to plaintiff and determine coverage." Wise testified that he relayed this information to plaintiff, and advised that the subfloor not be disturbed until an IAQ test was performed. At the same time, he testified that despite the mold, U.S. Disaster would have removed the subfloor if plaintiff had so directed.

U.S. Disaster has proffered two documents that it claims were signed by plaintiff on the last day of services, i.e., 2/18/12, after Wise had explained that they found mold.[5] Plaintiff agrees that her signature appears on the documents but has no recollection of being shown the documents or signing them. We will review the import of these documents later in this opinion.

Walsh testified that she, thereafter, left two messages on plaintiff's voicemail seeking to discuss coverage, but that plaintiff did not return her calls. Wise similarly testified that he called plaintiff after they stopped work and left a voicemail, but that plaintiff did not respond.

In April 2012, plaintiff hired Dr. Mark Banner, a home inspector, whose report states that inspection of the kitchen revealed a warped wood floor in the hallway near the kitchen and stated that where the linoleum was removed in the kitchen, "[the] subfloor is exposed and has water stains and black-colored mold." Testing revealed all areas on the first floor to contain Stachybotrys[6] and Chaetomium[7] neither of which was detected in the outdoor areas around the house. In addition, the testing revealed that Penicillium and Aspergillus levels were 10 to 20 times higher on the first floor than outdoors. On June 19, 2013, Banner inspected the home again and noted, "Water damage and mold can be seen on the subfloor, the base of the walls around the kitchen, and on the kick board under the sink cabinet. Water stains were observed on the subfloor, joists, and paneling under the kitchen in the cabinet." The levels of airborne mold spores in the home continued to be at levels consistent with those he found earlier.

It is well-documented, and undisputed for purposes of the summary disposition motions, that plaintiff developed serious pulmonary and auto-immune illnesses as a result of toxic mold contamination that occurred in the home following the flood on February 13, 2012. She was twice hospitalized, and has presented reports from her physicians documenting her illnesses and their conclusion that they were caused by exposure to toxic mold.

## II. ANALYSIS

---

[5] See n.4, supra, regarding the inconsistent dates on these documents.

[6] Stachybotrys is

> An antigenic green-black mold that grows on wood, paper and cotton products provided that there is constant moisture. Stachybotrys can produce toxic chemicals called mycotoxins that are present on spores and small fragments of the fungus released into the air. Some people have a reaction to these mycotoxins with coughing, wheezing, runny nose, irritated eyes or throat, skin rash or diarrhea. [https://www.medicinenet.com/mold_exposure/article.htm (accessed May 7, 2018)].

[7] According to the report, Chaetomium "is similar to Stachybotrys in that it is not a normal fungus for indoor environments, it is usually present in very wet environments, and it can produce some of the same mycotoxins."

The trial court granted summary disposition to both defendants.[8]  In reviewing that decision we consider, as to each defendant: (a) whether defendant owed a duty to plaintiff; (b) whether there is a question of fact that this duty was violated; and (c) whether any claim was extinguished by release.

## A. DUTY

A plaintiff in a negligence action is required to prove "duty, breach of that duty, causation, and damages." *Fultz v Union-Commerce Assoc*, 470 Mich 460, 463; 683 NW2d 587 (2004).  "The threshold question in a negligence action is whether the defendant owed a duty to the plaintiff.  It is axiomatic that there can be no tort liability unless defendants owed a duty to plaintiff." *Id*. (quotation mark and citation omitted).  "Every person engaged in the performance of an undertaking has a duty to use due care or to not unreasonably endanger the person or property of others." *Hill v Sears, Roebuck and Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). "Generally, the duty that arises when a person actively engages in certain conduct may arise from statute, a contractual relationship, or by operation of the common law . . . ." *Id*.[9]

Plaintiff is not a party to the insurance policy, and does not claim that a duty was owed to her under the policy.  Rather, plaintiff argues that defendants owed her—as a person directly affected by the flood and the remediation work—a common-law duty to act in a non-negligent manner and to exercise reasonable care. *Hill*, 492 Mich at 660.  That a contract exists between plaintiff's mother and Farmers does not bar plaintiff from suing defendants in tort where there is a non-contract-based duty of care. *Id*. at 660-661.  To determine whether such a duty of care exists, a court should consider "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Id*. at 661.  If there is no evidence of a relationship between the parties or that the harm was foreseeable, then there is no duty. *Id*.

### 1. Plaintiff's claims against Farmers

Plaintiff argues that Farmers owed and violated duties to:  (1) hire a qualified mitigation company to mitigate the water damage, (2) warn her of the risks associated with mold and advise her to leave the home because of the mold, and (3) not to direct or control the scope of U.S. Disaster's work.  Even accepting plaintiff's claim that Farmers selected U.S. Disaster to do the work, plaintiff has failed to state and/or support a claim against Farmers.

Plaintiff has not provided any evidence to support the first of these claims, i.e., that U.S. Disaster was not a qualified company to remediate the flood itself.  To the degree that plaintiff argues that U.S. Disaster was not capable of handling a mold situation, this also is unsupported

---

[8] This Court reviews de novo a trial court's decision to grant summary disposition under MCR 2.116(C)(10). *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012).

[9] Whether a defendant owes a duty to plaintiff is a question of law, which we review de novo. *Fultz v Union-Commerce Assoc*, 470 Mich 460, 463; 683 NW2d 587 (2004).

by the record. Wise testified that the company is capable of mold remediation and has done them in the past, and plaintiff has not offered any evidence to the contrary.

As to the second claim, plaintiff has failed to establish the existence of a duty by Farmers to warn her of the hazards of mold contamination and/or direct her to leave the house. As the trial court aptly stated, "Plaintiff argues that Farmers had a duty to [her] to advice of the mold in the premises. It is not clear how Plaintiff claims this duty arises, but even if the Court could conceive of a set of facts where an insurance company would owe such a duty to the occupant of the home when the insurance contract specifically excludes any liability for mold, such facts are not present in this case." The trial court was correct. Plaintiff has not cited any cases in which an insurance company was held to have such a duty.

Plaintiff directs us to *Conant v State Farm & Cas Co*, unpublished per curiam opinion of the Court of Appeals, issued May 23, 2006 (Docket No. 260524). She argues that this case supports her view that an insurer can be held liable to a third party for negligent performance of water remediation resulting in the spread of dangerous mold. Though we are not bound by *Conant*, an unpublished opinion, we find it both instructive and distinguishable.[10] In *Conant,* the plaintiffs' homeowner insurer instructed the contractor to cut holes in plaintiffs' bedroom walls in order to discover the source of the leak causing the water damage. *Conant*, unpub op at 1. At trial, plaintiff presented proof that cutting the holes dislodged dormant mold spores that until then had been contained. The spores then became airborne and caused injury. The jury found for plaintiff and we affirmed, because by affirmatively directing the contractor to cut holes in the wall, the insurer created a new risk or greatly increased the risk of harm from an already-existing risk. *Id*. at 5. In this case, plaintiff has not proffered evidence that Farmers directed U.S. Disaster to take action that would create a new, or worsen an already-existing, hazard.

Plaintiff's third claim against Farmers presents a closer question. She alleges that Farmers directed U.S. Disaster not to remove the subfloor and in so doing, improperly limited the scope of work. Factually, this claim rests solely on plaintiff's testimony that she overheard a telephone conversation between an employee of U.S. Disaster and a Farmers' representative in which the representative told the U.S. Disaster employee not to remove the subfloor. Whether plaintiff's testimony is sufficient to create a question of fact on this issue is a close question. On the face of it, plaintiff's testimony alone is sufficient to do so. However, plaintiff's testimony is vague and she never specifically claims that she overheard Farmers's side of the conversation or that someone from U.S. Disaster told her what the representative said. In her deposition testimony, plaintiff stated that she overhead a U.S. Disaster employee call Farmers and asked, "Should I take [the subfloor] out or leave it in?" and that the representative instructed U.S. Disaster to leave the subfloor in. The record is not clear if plaintiff claimed to have overheard this direction herself or if the U.S. Disaster employee relayed the information to her.

Wise testified that Farmers did not instruct U.S. Disaster to leave the subfloor in place. Indeed, he testified that the decision was made solely by himself and plaintiff. Moreover,

---

[10] See MCR 7.215(C)(1), stating that "[a]n unpublished opinion is not precedentially binding under the rule of stare decisis."

assuming that Farmers told U.S. Disaster that the subject work would not be covered by the policy, it is difficult to see why such a statement would be improper or be construed as a directive. In sum, plaintiff has failed to set forth a viable claim against Farmers.[11]

## 2. Plaintiff's claims against U.S. Disaster

Plaintiff asserts that while performing the duties in its contract with the insured, U.S. Disaster owed her, as a resident of the house and an individual with whom the company had repeated direct contact at the worksite, a common law duty to take reasonable precautions to assure that their work did not harm her or make an existing hazard more dangerous. We agree.

In her complaint, plaintiff alleged that U.S. Disaster failed to: (1) properly remove all water damaged and defective materials, (b) perform containment to prevent cross-contamination to non-affected areas, (c) address and abate all contamination resulting from the water damage, (d) follow proper environmental and industry standards on all work that was performed, (e) recommend that an independent third party indoor environmental professional be consulted to determine if biological hazards existed prior to and following water damage repairs, (f) abide by industry standards for water mitigation and/or water damage restoration, (g) recommend that an independent third party environmental professional evaluate the home, and (h) warn plaintiff of the risk of staying in the home and the possible adverse health effects associated with mold exposure.

The common law provides a straightforward list of factors to consider when determining if a party has a relevant common law duty to another. The primary factors are the relationship of the parties and the foreseeability of harm. Additional factors include the burden on the defendant to meet that duty and the seriousness of the risk posed to the plaintiff. *Hill*, 492 Mich at 661.

U.S. Disaster directs us to the result in *Hill*, i.e. that no duty was found. More telling than that result, however, is the contrast between the facts of *Hill* and those presented here. In *Hill*, the defendant installers came to the plaintiff's home to install a washer and electric dryer she had purchased. *Hill*, 492 Mich at 655-656. They were in the home for approximately 12 minutes, installed the equipment, and left. *Id.* There was never any problem with the equipment. Apparently unbeknownst to plaintiffs, the prior residents of the home had failed to replace the gas line cap after they uninstalled their gas dryer. *Id.* The lack of a gas cap did not cause any problem at any time from when plaintiffs moved into the home until four years after they installed their electric dryer. *Id.* at 656. After those four years, there was a gas leak due in part to the uncapped line. *Id.*

As noted, the gas line had been left uncapped by the prior homeowners; there was no evidence that the defendant installers discovered, removed, or somehow dislodged a cap. *Id.* at 663-664. Although the defendants were not working with the gas line (they were installing an electric dryer), the plaintiff argued that given the defendants' proximity to the line while

---

[11] Given this conclusion, we need not address Farmers' cross appeal that the "suit against us" provision in the policy barred plaintiff's claims.

working, they had a duty to discover that it was uncapped and to either cap it or tell the homeowners to do so. *Id*. at 665-666.

The instant case presents a completely different situation. In contrast to *Hill*, where the installers were in the home for 12 minutes, here, U.S. Disaster's employees were in the home with plaintiff for three days. They knew she was residing there and had interacted with her several times about the work. Moreover, the alleged duty in *Hill* was outside the scope of the contract that defined their work. By contrast, here, the danger, i.e., mold, was discovered by U.S. Disaster and it did not remove it even though the contract it had with plaintiff's mother required it to "undertake best efforts to clean and remove any mold and mildew it discovers" and, putting aside the mold, they failed to remediate the flood, leaving some areas saturated. These alleged failures are far more tied to a duty than is an installer's failure to discover a hazard that has nothing to do with the work he is there to do.

The next factor is whether the harm was foreseeable, and it clearly was since U.S. Disaster admits that it understood the risk posed by mold. There is no need in this case to search for reasons why it knew or should have known because it is undisputed that the company and its employees knew of the forseeable harm at all relevant times.[12] Nevertheless, it stopped work and did not return—facts which are also undisputed. Wise admitted that U.S. Disaster did not "successfully reach dry standard," and that the company performed only "a partial mitigation."

Given the nature of the relationship and the foreseeability of harm, we conclude that U.S. Disaster owed plaintiff a duty to perform its work so as not to create any new harm or worsen any already-existing risk. *Fultz*, 470 Mich at 468-469; *Hill*, 492 Mich at 672.

Plaintiff argues that U.S. Disaster created a new hazard by uncovering the subfloor and then leaving it, and other wet areas, in place. She also argues that U.S. Disaster failed to warn her of the danger of mold. U.S. Disaster refers us to the release, which states in pertinent part that it "notified me/us of potential mold growth at the property." Apart from the authenticity problems with the documents proffered by U.S. Disaster, as noted in footnote 4, supra, it is difficult to see how the quoted statement advises the recipient of the health dangers posed by the mold nor gives any indication that plaintiff should not continue to live there until it was remediated.[13]

---

[12] Should there be any dispute as to defendant's knowledge, there is more than sufficient evidence to create a question of fact so as to allow the case to proceed. "The question whether a duty exists . . . depends in part on foreseeability—whether it is foreseeable that the actor's conduct may create a risk of harm to the victim . . . ." *McMillian v State Highway Comm*, 426 Mich 46, 61-62; 393 NW2d 332 (1986). "When reasonable minds may differ regarding the application of the reasonableness of the risk of harm, the question is best left to a jury." *Id*. at 63.

[13] When asked whether he advised plaintiff to leave the house because of the mold, Wise stated, "I didn't tell her she should get out." When asked if he had previously testified that he advised

We hold that summary disposition is not appropriate on this issue because conflicting evidence was presented as to the decision regarding the subfloor, and whether plaintiff was aware of the mold. The fact that the mold was found in additional areas in 2013, is also evidence that even if there was already mold in the house, U.S. Disaster's action in performing only a partial mitigation of the flood made an existing dangerous condition more hazardous.

In sum, U.S. Disaster owed a tort duty of reasonable care to plaintiff and there is a question of fact whether that duty was violated.

## C. RELEASE

U.S. Disaster asserts that regardless of whether there was a duty and whether it was breached, plaintiff's case must be dismissed because she signed a release.[14] We reject that argument for several reasons. First, there is a question of fact as to when the release was signed and what was known at the time. Second, there is, at minimum, a question of fact as to whether plaintiff signed the release as her mother's attorney-in-fact or in her individual capacity. Third, there is no evidence in the record that the release was signed in exchange for some consideration.

The release reads:

> I/We Lillian Abraham owner(s)/resident(s) of the property located at 3217 Elizabeth St. Melvindale, MI 48122, hereby acknowledge that a representative of 7073—ServiceMaster Don't Panic ("ServiceMaster Clean") has notified me/us of potential mold growth at the property address listed above and that I/we have instructed Service Master Clean to stop any further procedures, treatment and remediation related to this condition.
>
> I/We hereby release and agree to indemnify and hold harmless Service Master Clean and/or any of its affiliates, agents, officers, employees, consultants, successors, and all other related persons, firms, corporations, associations or partnerships of and from any and all claims, actions, causes of action, demands, rights, damages, costs, loss of service, loss of rents, expenses and compensation whatsoever, which I/we may now have or may have in the future as a result of any foreseen or unforeseen consequences of the contamination and/or any work performed or not performed by ServiceMaster Clean to the to the above stated property.

There is conflicting evidence as to when the release was signed. Plaintiff testified that that she could not recall whether she signed the release and other documents presented to her, but

---

plaintiff to consider moving out or getting out of the house, Wise testified, "No, I don't think I said that."

[14] Whether a contract language is ambiguous and the interpretation of a contract are questions of law which this Court reviews de novo. *Klapp v United Group Agency*, 468 Mich 459, 463; 663 NW2d 447 (2003).

she admitted that the signatures in the documents were hers. She testified that the documents were presented to her immediately upon U.S. Disaster's employee's arrival at the home. If true, this comports with the date on the signature line of the release showing that it was signed on February 15, 2012 at 6:50 a.m. If plaintiff signed the release immediately after U.S. Disaster arrived, at a time when the mold had not been discovered,[15] the release was untimely as its premise—that plaintiff had been told that there was mold—could not have yet occurred.

On the other hand, Wise testified that the release was presented to plaintiff after he had discovered the mold and spoken to Farmers recommending an IAQ test. He testified that they stopped work only after plaintiff signed the release and told them to stop work. According to Wise's testimony, plaintiff signed the release on the second day of mitigation services, which was February 16, 2012. However, that date does not appear anywhere on the release, which is dated February 21, 2012, and shows plaintiff's signature as having been executed on February 15, 2012.

The question when the release was signed is a question of fact that must be resolved before the validity of the release can be determined.

U.S. Disaster's reliance on the release fails for a second reason as there is, at a minimum, a question of fact whether she signed it on behalf of her mother or herself. It is undisputed that plaintiff had no authority to retain or direct U.S. Disaster except in her capacity as attorney-in-fact for her mother who was both the homeowner and the insured. This is consistent with the contract which lists Lillian Abraham as both the "Insured" and the "Homeowner." It also stated that "Homeowner listed above [i.e. Lillian] [is] herein referred to as the CUSTOMER." Clearly, Lillian Abraham was the customer, not plaintiff in her individual capacity. Similarly, the "Equipment Responsibility Form" signed by plaintiff does not bind her individually but provides that "the *customer* . . . is responsible for the loss or theft of . . . equipment" (emphasis added).[16] Finally, the release itself states that the "Customer Name" is Lillian Abraham.

If plaintiff signed the document only on her mother's behalf, she cannot be bound by the terms of the release. A contract between a disclosed principal[17] and a third party is only enforceable by the principal against the third party and vice versa. See 2 Restatement Agency 3d, § 6.01. U.S. Disaster claims that *Chris Nelsen & Son, Inc v Shubow*, 374 Mich 403; 132 NW2d 122 (1965), stands for the proposition that by failing to specifically indicate on the contract that she was signing for her mother as her guardian, plaintiff became a party to it. This thoroughly misreads *Chris Nelsen*. In that case, the defendants were officers of real estate

---

[15] According to U.S. Disaster's records, its initial inspection found no visible mold.

[16] Defendant argues that its workers believed that plaintiff was herself Lillian Abraham. To the degree defendant's misunderstood plaintiff's role or identity, their unilateral error cannot make plaintiff a party to the contract or related release. Moreover, there is no evidence that she attempted to deceive defendant's staff about her identify or role.

[17] Farmer's claim documents indicate that plaintiff identified herself as the insured's daughter and there is no evidence that she ever stated otherwise.

corporations that had contracted with the plaintiff for the supply of materials for a real estate development. *Id*. at 405. When the corporations fell behind on payments due under the contract, the defendants signed individual promissory notes to forestall any action against the corporation and personally made payments on those notes. *Id*. at 405-407.

This case bears little, if any, resemblance to *Chris Nelsen.* First, the documents in *Chris Nelsen* were intended to provide personal guarantees of corporate debts from corporate officers. If the defendants in that case were signing for the corporation rather than themselves, these guarantees would have been meaningless. Second, the only named individual throughout the documents in this case was Lillian; in *Chris Nelsen*, the officers were named individually. In the instant case, none of the documents named plaintiff as a customer.

U.S. Disaster's argument has an additional defect. Even assuming that plaintiff signed in a personal capacity, there is no evidence that the release was obtained in exchange for any consideration. U.S. Disaster has not identified any benefit plaintiff received in exchange for the release. She received no payment or any provision of special services, and signing the release was not a condition of participation in some activity. To be valid, a release must be supported by adequate consideration, which requires (1) a legal detriment, (2) which induces a promise to release another from liability, and (3) that the promise to release induced the legal detriment. See *Babcock v Public Bank*, 366 Mich 124, 135; 114 NW2d 159 (1962); *Paterek v 6600 Ltd*, 186 Mich App 445, 451; 465 NW2d 342 (1990). See also *Sands Appliance Servs, Inc v Wilson*, 463 Mich 231, 242; 615 NW2d 241 (2000) (holding that "[c]onsideration for agreements exists where there is a benefit on one side, or a detriment suffered, or service done on the other."); *Paterek*, 186 Mich App at 451 (rejecting plaintiff's argument that a release and waiver was invalid for lack of consideration when the agreement allowed plaintiff to play softball on defendant's field in exchange for plaintiff's promise to release the defendant from liability).

In *Chris Nelsen,* the defendants argued that that there was no consideration to support such an obligation but the court held that "the execution by other stockholders, officer or directors, of their own personal notes for the benefit of and to aid a corporation in which they have an interest is a valuable consideration for the execution of such notes." *Chris Nelsen*, 374 Mich at 406. Here, there is no evidence that plaintiff received or was promised any consideration for signing the release.

Finally, to the degree this is a factual dispute, additional evidence should be considered. Parol evidence is admissible to show the intent of the parties where one signs in a manner that makes it doubtful whether he or she signs individually or in a representative capacity. *Simon v Tropp*, 252 Mich 559, 561; 233 NW 415 (1930) (finding that parol evidence was admissible to establish whether the defendant signed in his individual or representative capacity where "[t]he manner in which the signature was appended raises . . . doubt . . . .").

## E. AMENDMENT OF COMPLAINT

Plaintiff argues that the trial court abused its discretion when it refused to allow her to amend her complaint against U.S. Disaster to add a claim that its use of the antimicrobial spray was negligent and to add a claim of gross negligence.[18]

MCR 2.118(A)(2) provides that leave to amend pleadings "shall be freely given when justice so requires." A motion to amend a complaint "should be denied only for particularized reasons, such as undue delay, bad faith, or dilatory motive on the part of the movant, a repeated failure to cure deficiencies in the pleadings, undue prejudice to the opposing party by virtue of allowing the amendment, or futility of amendment." *Boylan v Fifty Eight, LLC*, 289 Mich App 709, 728; 808 NW 2d 277 (2010). We review a denial of leave to amend a complaint for an abuse of discretion. *Casey v Auto Owners Ins Co*, 273 Mich App 388, 400-401; 729 NW2d 277 (2006). A trial court abuses its discretion when its decision falls outside the range of reasoned and principled outcomes. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 761-762; 685 NW2d 391(2004).

"If the grounds asserted [in support of summary disposition] are based in subrule (C)(8), (9), or (10), the court shall give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the evidence then before the court shows that amendment would not be justified." MCR 2.116(I)(5). In its opinion denying plaintiff's motion for summary disposition, the trial court did not expressly indicate that it was denying leave to amend the complaint. Therefore, it is uncertain whether the trial court ruled on the request and if so, on what grounds. Accordingly, on remand, the trial court should expressly address plaintiff's motion to amend her complaint under MCR 2.116(I)(5) and MCR 2.118.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Douglas B. Shapiro
/s/ Mark T. Boonstra

---

[18] A reading of plaintiff's motion for reconsideration shows that the gross negligence count was directed to U.S. Disaster only.